Gary L. **ZAMBITO**, Plaintiff,

v.

**PARAMOUNT PICTURES CORP.**, Gulf & Western Industries, Inc., Lucas-Film, Ltd., George W. Lucas, Jr., Steven Spielberg, Lawrence Kasdan and Philip Kaufman, Defendants.

No. 83 CV 4809.

United States District Court, E.D. New York.

July 22, 1985.

Markewich, Friedman & Markewich, P.C., New York City, for plaintiff; Robert Markewich, New York City, of counsel.

Pryor, Cashman, Sherman & Flynn, New York City, for defendants; Stephen F. Huff, Tom J. Ferber, New York City, of counsel.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This is an action for copyright infringement under Title 17 of the United States Code. Plaintiff Zambito, an archaeologist-screenwriter, asserts that defendants' movie, "Raiders of the Lost Ark" ("Raiders"), infringes copyrightable material contained in his screenplay, "Black Rainbow" ("Rainbow"). Both sides have moved for summary judgment on the issue of substantial similarity. For the reasons set forth below, defendants' motion for summary judgment is granted and plaintiff's motion is denied.

### Facts

For the purpose of this motion only, defendant concedes the validity of plaintiff's copyright and defendants' access to the plaintiff's copyrighted work.[1] Thus, the only task facing the Court is to determine whether the two works are sufficiently similar to raise a genuine issue of copyright infringement; if such an issue exists a trial is, of course, required.

#### "Rainbow"

Plaintiff's screenplay, "Black Rainbow," is the story of archaeologist Zeke Banarro's ("Zeke") expedition to the Andes of Peru in search of pre-Columbian gold artifacts. In the preamble to "Rainbow," Zeke is introduced as "a legitimate archaeologist who became a renegade treasure hunter or *huaquero*."

---

1. To establish a copyright infringement, a plaintiff must prove ownership of the copyright and copying by the defendant. *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir. 1976). Copying is commonly proved by circumstantial evidence of defendants' access to the copyrighted work and substantial similarities as to protectible material in the two works. *Id.*

In the opening scene, Zeke is informed by his former lover, Michael Colby, a female museum curator, that Zeke has been replaced as head of an expedition to Peru. Undaunted, Zeke finances his own "bootleg" expedition with the help of a cocaine dealer who fronts Zeke the money in exchange for Zeke's promise to smuggle cocaine from Peru.

Upon arrival in Peru, Zeke and his sidekick, Justo, a Peruvian Indian native, pause to taste the pleasures of cocaine and prostitutes. After assembling an entourage of Indian natives and taking as a partner, Alvarado, who supplied horses and pack animals, the party then proceeds on the expedition.

Along the way, Tumba, Alvarado's servant/mistress, gives birth to a son. Shortly thereafter, Alvarado offers Tumba's services as a prostitute in return for the other Indians' share of the treasure. Zeke seeks to prevent this exploitation by pacifying the natives with cocaine. Ironically, Tumba, who is understandably grateful for this act of humanity, rewards Zeke with sexual favors.

Later, an old Indian mystic tells Zeke that he can locate the cave with the great anaconda snakes, and hopefully the treasure, by observing the reflection of the sun off the side of the cliffs. Upon locating the cave, the party rappells * down the side of the cliff, fights off the anacondas with molotov cocktails, and uncovers the treasure in a burial site inside the cave.

As they are about to begin their trek back from the clifftop, the expedition is confronted by the script's principal antagonist, Von Stroessner, and his band of thieves. As it turns out, Von Stroessner was hired by Michael Colby and the museum to follow Zeke and liberate him of his new-found treasure. A fight ensues, in which Zeke and Von Stroessner are wounded and several Indians are killed. Zeke

* "descent of a precipitous cliff by means of a double rope passed under one thigh, diagonally across the body, and over the opposite shoulder."

ultimately shoots Von Stroessner in cold blood.

The expedition party continues the journey back, only to be confronted by the Peruvian National Guard. In the ensuing gunfire, Justo is mortally wounded, the remaining Indians are killed, and Zeke and Alvarado are forced to flee through the dense jungle carrying what little gold they can carry. Zeke ultimately shoots Alvarado in a quarrel over the remaining treasure, and the story ends with Zeke hiking back to civilization.

*"Raiders"*

"Raiders of the Lost Ark," by now familiar to movie-goers everywhere, is the swashbuckling adventure story of archaeologist Indiana Jones ("Indy"). After a brief introductory expedition to South America in 1936, which is foiled by Indy's arch-rival, Belloq, a French mercenary archaeologist, Indy returns home only to find that his services are required by the United States Army. It seems that army intelligence has revealed that Hitler is digging outside of Cairo for the lost Ark of the Covenant. Hitler, we are told, seeks to take advantage of the Ark's vast supernatural powers. Indy's mission, should he choose to accept it, is to beat Hitler to the Ark.

Indy flies to Nepal where he locates Marion Ravenwood, his former lover and the daughter of his mentor. Marion has the headpiece to the Staff of Ra, which is the key to locating the Ark. When attached to a staff and placed in a miniature map room in the ancient city outside Cairo, the headpiece will direct the sun's rays to the location of the Well of Souls, in which the Ark is hidden. After Indy saves Marion from several ruthless Nazis, who are also after the headpiece, the pair heads for Cairo.

There, Indy discovers that Hitler has hired his old rival, Belloq, to direct the excavation. Belloq takes great interest in

(Webster's Third New International Dictionary (unabridged), copyright 1981 by G. & C. Merriam Co., p. 1882).

Marion, who has since been abducted by the Nazis.

Meanwhile, Indy and Sallah, an Egyptian friend, manage to sneak into the excavation and descend into the map room, where they discover the location of the Well of Souls. As they are about to descend into the Well, they discover that its floor is covered with tiny asps. Indy fends off the snakes by dousing them with fuel oil and setting them afire.

Indy and Sallah place the Ark in a crate and hoist it to their helpers waiting above. Once Sallah has ascended, the Nazis, who have observed Indy's discovery, thrust Marion into the well with Indy and seal it up. The two manage to escape through the wall, however, to a neighboring catacomb.

After blowing up a Nazi airplane, Indy realizes that the Ark is now aboard a truck headed for Cairo. In a famous "chase" scene, Indy, riding a white steed, catches up with the Nazi caravan, gains control of the truck, fends off the Nazis, and escapes into the maze of the streets of Cairo.

Indy and Marion depart Cairo with the Ark aboard a ship, only to be overtaken by a Nazi U-boat. Indy, who managed to elude capture, follows the Nazis to an unidentified Mediterranean Island only to be taken captive once again. With Indy and Marion tied up nearby, Belloq and the Nazis open the Ark in a ritualistic ceremony. The grotesque spirits released therefrom converge upon the Nazis in a bizarre swoop of destruction. Only Indy and Marion, who in Old Testament fashion have kept their eyes closed throughout, are spared.

Back in Washington, D.C., as the film closes, we see the crated Ark being transported to an army warehouse where, among thousands of other identical crates, it will lie forever forgotten.

### Discussion

■ Although the question whether two works are substantially similar usually presents a factual issue that does not lend itself to summary judgment, *Arnstein v. Porter,* 154 F.2d 464, 473 (2d Cir.1946), the Second Circuit has recognized the appropriateness of summary judgment in copyright actions, "permitting courts to put 'a swift end to meritless litigation' and to avoid lengthy and costly trials." *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980) (quotation omitted). *See, e.g., Smith v. Weinstein,* 578 F.Supp. 1297 (S.D.N.Y.), *aff'd without op.,* 738 F.2d 419 (2d Cir.1984). Clearly, summary judgment is appropriate where, after reviewing the competing works, the Court concludes either that any similarity between the works concerns only non-copyrightable elements or that no reasonable jury, properly instructed, could find the works substantially similar. *Warner Brothers, Inc., v. American Broadcasting Companies, Inc.,* 720 F.2d 231, 240 (2d Cir.1983). *Cf. Musto v. Meyer,* 434 F.Supp. 32, 36 (S.D.N.Y.1977), *aff'd* 598 F.2d 609 (2d Cir.1979).

The test for substantial similarity has been succinctly described as "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Smith,* 578 F.Supp. at 1302 (quotation omitted). In assessing whether a properly instructed jury may find two works substantially similar, it is helpful to review a few basic principles delineating the scope of copyright protection.

■ It is, of course, well-settled that a copyright protects only an author's original expression of an idea, not the idea itself. *Smith,* 578 F.Supp. at 1301. As the Second Circuit has noted:

> While the demarcation between idea and expression may not be susceptible to overly helpful generalization, it has been emphasized repeatedly that the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterizations.

*Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.1976). In addition, a copyright affords no protection

to so-called *"scenes a faire," i.e.,* characters, settings or events which *necessarily* follow from a certain theme or plot situation. *Id.; Hoehling,* 618 F.2d at 979.

Plaintiff concedes, as he must, that the basic idea of an archaeologist searching for artifacts is unprotectible. He argues, however, that actionable similarities lie in the characters, devices and action employed in expressing that idea. Defendant, of course, argues that any similarities existing between the two works are, in fact, unprotectible *scenes a faire.* I agree.

It is unnecessary to discuss every alleged similarity in the two works; a brief discussion of the salient portions of plaintiff's argument is illustrative.[2]

■ First, it is noted that the mood and "feel" of the two works are completely different. *Cf. Reyher,* 533 F.2d at 91. "Rainbow" is, for the most part, a somber, vulgar script replete with overt sexual scenes, cocaine smuggling and cold-blooded killing. "Raiders," on the other hand, is a tongue-in-cheek, action-packed, Jack Armstrong, all-American adventure story.

■ Nor is there substantial similarity in the settings of the two works. "Rainbow" is set almost entirely in a Peruvian jungle. Although "Raiders" begins with a very brief expedition to a booby-trapped cave in a South-American jungle, most of the story is set in and around Cairo. Thus, any similarity of locale is simply too insignificant to warrant protection. *See Burroughs v. Metro-Goldwyn-Mayer, Inc.,* 683 F.2d 610, 626 (2d Cir.1982).

■ Plaintiff fares no better in his claim of character infringement. As the Second Circuit has stated, "[s]tirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement." *Warner Brothers,* 720 F.2d at 242. A review of plaintiff's claims of

character infringement indicates that no jury could reasonably find the characters substantially similar.

Plaintiff argues, initially, that actionable similarity lies between the two protagonists, Zeke Banarro and Indiana Jones. Any similarity ends, however, with the fact that both are male and both are archaeologists. Zeke is basically a serious, self-interested, individual who betrays both the museum for which he works and his illegitimate "backer," strikes out on his own, and ends up shooting his adversaries in cold-blood. Indy, on the other hand, is a larger-than-life adventurer who, in matinee-idol fashion, remains loyal to truth, justice and the American way.

Nor does actionable similarity exist regarding the principal antagonists, Belloq in "Raiders" and Von Stroessner in "Rainbow." Belloq is an articulate, cultured French archaeologist who is Indy's established rival. Although not a Nazi himself, Belloq has been hired by Hitler to find the lost Ark.

Von Stroessner, whose full name is Juan José de Maria Lopez y Von Stroessner, is described as a mestizo thief who preys upon archaeologists. Plaintiff claims that the name Von Stroessner was chosen to depict the character as a post-war Nazi. Nothing in the script, however, indicates that Von Stroessner is, in fact, a Nazi.[3] Indeed, it is ultimately revealed that Von Stroessner was hired, not by the Nazis, but by the museum where Zeke formerly was employed.

Plaintiff's assertion that he intended the Von Stroessner character to depict a Nazi does not present an actionable claim. The law of copyright protects the author's actual expression of an idea, and not the idea as it existed in the author's imagination. Clearly, "no character infringement claim can succeed unless plaintiff's original con-

---

2. The Court is, of course, mindful of Chief Judge Kaufman's admonition that "in distinguishing between themes, facts and *scenes a faire* on the one hand, and copyrightable expression on the other, courts may lose sight of the forest for the trees." *Hoehling,* 618 F.2d at 979.

3. The only remote reference to Nazism in plaintiff's script occurs when, upon being introduced to Von Stroessner, Zeke replies sarcastically "I'm Adolf Hitler." Screenplay at 68.

ception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines." *Smith*, 578 F.Supp. at 1303.

In any event, even if the distorted inference that Von Stroessner is a Nazi could be drawn, no actionable similarity would lie. It is significant that "Raiders" is set in the late-1930's, the Nazi era. "Rainbow," on the other hand, obviously takes place in a contemporary setting, as is evident from various references to the World Trade Center, the King Tut exhibit at the Metropolitan Museum of Art, Laurance Rockefeller, and the cocaine trade. Thus, any similarity caused by a remote reference to Nazism is, to say the least, superficial.

Finally, and incredibly, plaintiff asserts a similarity between Marion Ravenwood of "Raiders" and a combination of Tumba, the pregnant Indian mistress, and Michael Colby, the ambitious museum curator, of "Rainbow." The only similarities between these characters, however, are that they are female and that they share the common experience of a sexual encounter with the respective protagonists.

■ Upon close inspection, plaintiff's remaining claims of actionable similarity fall within the category of unprotectible *scenes a faire*. That treasure might be hidden in a cave inhabited by snakes, that fire might be used to repel the snakes, that birds might frighten an intruder in the jungle, and that a weary traveler might seek solace in a tavern, all are indispensable elements to the treatment of "Raiders" theme, and are, as a matter of law, simply too general to be protectible. *See Hoehling*, 618 F.2d at 979.

Moreover, these scenes were given dissimilar treatment in the respective works. For instance, in "Rainbow," the party's access to the cave was hindered by giant anaconda snakes that ultimately were frightened away by molotov cocktails. In "Raiders," the floor of the Well of Souls was covered by hundreds of tiny asps and a cobra, that were fended off by burning them with fuel oil.

Likewise, an examination of plaintiff's claim that both scripts utilize sunlight to locate the treasure reveals a similarity too general to afford protection. In "Rainbow," the treasure-filled cave is located by observing the reflection of the sun off a crystallized rock formation on the side of a cliff. In "Raiders," however, the location of the Well of Souls is determined in a map room by observing the reflection of the sun through the headpiece of the Staff of Ra.

■ Finally, plaintiff's claim of dialogue infringement involves generalized insignificant pieces of dialogue which also necessarily flow from a common theme.

In short, having thoroughly reviewed all the plaintiff's claims (and having thoroughly enjoyed both scripts), I am led ineluctably to the conclusion that a "comparison of the two works reveals that their similarity exists only at a level of abstractions too basic to permit any inference that defendants wrongfully appropriated any 'expression' of plaintiff's ideas." *Giangrasso v. CBS, Inc.*, 534 F.Supp. 472, 478 (E.D.N.Y. 1982).

Accordingly, defendants' motion for summary judgment is granted and plaintiff's motion is denied. Defendants' request for attorney's fees is denied.

The complaint is hereby dismissed.

SO ORDERED.